All right, you may proceed. Thank you. Good afternoon. May it please the court. My name is Ryan Moore. I represent the appellant, Mr. Guerrero. I'll reserve two minutes for rebuttal and I'll watch the clock. I'll address first and focus on the claim that the encounter on the side of the freeway north of Tucson became a de facto arrest under all of the circumstances, including that the very compliant Mr. Guerrero was handcuffed by the road and then made to stand in handcuffs next to the police car for 41 minutes, awaiting others to arrive, left to believe that others were coming to take him in. The record is really remarkable because of the state troopers' testimony at the suppression hearing as to how utterly compliant and cooperative Mr. Guerrero was on the roadside with all of the handcuffing. And of course the court has held that the handcuffing is a substantial factor when you handcuff a compliant suspect in determining whether an arrest occurred. Now, the trooper told Mr. Guerrero, you're being detained, not arrested. But that at best, when the handcuffs are the reason for making the encounter feel arrest-like, telling someone they're not being And in any event, magic words shouldn't be able to override all of the circumstances. And it was all of the circumstances here that made this feel like an arrest. Remember when the trooper asked Mr. Guerrero if he had ammunition, and Mr. Guerrero answered, yes, I have 20,000 rounds in the car. The trooper asked him to stand far from the car, 30 feet to the side of the freeway, and 25 to 50 feet ahead during the search. And when the search confirmed that Mr. Guerrero had told the truth, now Mr. Guerrero was handcuffed. And so from a reasonable, innocent person in his position, you would think, why haven't I been sent back? If we're going to now wait for others to arrive, why haven't I just been sent back to that fence so far away from the car where I was? Now I'm in handcuffs. Then he's moved next to the police car, and the trooper was asked, did you put him in the car? And the trooper says, no, there was a dog in the car, canine. And so he's moved next to the police car, and now he waits there for 41 minutes, handcuffed on the side of the freeway, behind the back, in the daytime, where he has been completely and utterly compliant for this entire encounter. Counsel, Judge Gould, if I could interject a question, please. So I'm just speaking as one judge. I'm very sympathetic to your position, that under the circumstances, you're compliant, and polite client was arrested. But what I'd really like your argument to focus on in part is whether the trooper's finding 20,000 rounds of ammunition in the car gives probable cause for an arrest. No, Your Honor, and for the same reasons why we've argued strenuously that it doesn't supply reasonable suspicion. This is an item that is lawful to own and without even a background check. And so when you combine that with the fact that the trooper asked no questions at all about this ammunition, it doesn't amount to, we contend, even reasonable suspicion of an unlawful exportation crime. These items can be contraband under some circumstances, and they're generally legal under all other circumstances. And so the trooper had to do something to take this factor that could go either way and develop additional suspicion. I mean, and even if he didn't have to be the one to fully- Well, there were some other circumstances that were suspicious. Let's go over them. One of the first was that he had illegally tinted windows to conceal his identity, right? The windows were illegally tinted. Right. And the only purpose of that is to conceal identity. It's not to block sun, is it? All right. Well, I don't know. I guess I disagree that the only purpose is to conceal one's identity. But there were dark windows tinted. All right. Number one. Number two, the rounds involved, the ammunition, were not sporting rounds. They're not .22s. They're not .30.6s. They're Glock 9mm and, I guess, Kalashnikov 7.62s. Those are rounds for guns, for firearms that are used in aggressive mode. Right? Second, third, third, when asked who owned the car, he gave contradictory answers. He said, Sister A owned the car. But just a moment. No, it's Sister B. It's somewhat suspicious if you can't remember which sister owned the car. All right. Number four, he said he was on a trip to see his mother in Phoenix. But there was something wrong with his trajectory as to where he was found. He was going from Tucson down to the Mexican border, right? He was on his way from Phoenix back to Tucson. He was stopped on the freeway between Phoenix and Tucson. All right. So when you add those other matters together, given the tremendously large amount of rounds, 20,000, right? Those were, what, 20, 1,000 boxes? You still think that there's not a reasonable person wouldn't have a suspicion that a crime was about to be committed? Not without asking any further questions about the ammunition, which can be used for sporting purposes. And it's all lawful for sale to the public. But just imagine if the trooper had asked five or ten questions, you know, easy ones. Not questions that required a specialty in federal law or this particular crime, but do you have guns? What kind of guns fire these bullets? Do you have them? Where do you store them? Where are you going with them? Where did you get them? Something is going to either, it's all either going to sound right or something is going to sound off. Further questioning would have developed what would be the added information needed to take a suspicion that this large quantity of otherwise lawful ammunition is being used here for unlawful purposes. And we cite the Brown case for in support. But that's one gun. Well, this is enough ammunition for two guns. I mean, it's not like 20,000 rounds. It's enough for an army. It's not like 20,000 guns. It's enough for one or two people or a shooting club or, you know, one can imagine certainly lawful purposes for these. And then the other factors, you know, so at least without further questions, under the Brown case, we contend that it was at most susceptible to a very weak inference that this quantity was something illegal. And it certainly would have been easy for this trooper to ask. Counsel, Judge Gould, if I could ask a question and then I'll ask Judge Thomas if he could please give you a little extra time. Sure. Since I'm using up your, probably your rebuttal time. But my question is this. I can imagine lots of illegitimate uses for 20,000 rounds of this kind of ammunition. But I'm wondering what are the legitimate uses that you contend should have been obvious to a trooper? The questions would have made it simpler. But even without the questions, what are the lawful uses of such a huge quantity of ammunition that should have occurred? Sports shooting, buying for a group, buying for a lifetime supply, buying for a year's supply. You know, because Congress and Arizona have not drawn any line in terms of what's unlawful or what should leave someone subject to arrest based on any quantity of ammunition, it's difficult for the court to do so as well. But there are legitimate reasons why so much ammunition could be possessed. And the quantity raises questions. But they should have been asked. At the time of the cuffing, the trooper hadn't yet developed enough information, we contend, to get to what was needed for a probable cause. And the remaining factors, we contend, are really so innocuous. The nervousness that the district court relied on was an inference from the name issue with regard to the sister. And incidentally, if you look at PSR paragraph 34, the sister's name is Jacqueline Martha Guerrero. And the two names he gave were Martha and Jacqueline. Not that the district court could have considered that here. So that is different than nervousness that comes from shaking, inconsistencies, contradictory statements. It shouldn't get much weight, just like the other factors that the court listed. I'm over, so I will sit down. Thank you, counsel. Thank you. And we'll give you two minutes for rebuttal. Thank you. Good afternoon. May it please the court. Your honors, I am Angela Walker Woolridge, appearing on behalf of the United States in this case. The district court did not clearly err when it found that the trooper did not unreasonably prolong the traffic stop, which is a factual finding that this court reviews for clear error. And it's based on the totality of the circumstances and afforded a great deal of deference. The court did also not err in finding that there was no de facto arrest, or finding that reasonable suspicion existed for the extension of the stop. For these reasons, this court should confirm the district court's denial of the defendant's motion to suppress his statements. I just want to briefly point out that the statements are really the only evidence at issue here, contrary to what the defendant suggests in his reply. He did not challenge the initial traffic stop or consent to search. So the ammunition is admissible regardless. And in fact, the magistrate judge only recommended suppression of the statements, a recommendation to which the defendant did not object. He only- Do you think you have enough evidence to sustain a conviction without the statements? Pretty tough. It would be a challenge, Your Honor. It certainly would be a challenge. But in this case, there is no- The district court did not err in finding that those statements are in fact admissible. First of all, there was reasonable suspicion for the extension of the stop. We have to view the facts through the eyes of the officer, Trooper Amick in this case. And we have to give deference to the views of local officers and local district court judges as the Supreme Court has told us in Arvizu, and in fact gave a pertinent example. Because those judges and those officers are familiar with the particularities of a specific area and understand how in one context, such as the example in Arvizu, a busy San Francisco highway, innocuous conduct may suggest crime in another context, such as southeastern Arizona, as in here. If he had been detained south of Tucson, that would mean more than being detained north of Tucson in this context, correct? It may or may not, Your Honor, because the facts, and as the defendant admitted, this was the same corridor. This was the same part of the heavy smuggling route, both as testified and the court found in its findings, factual findings. This was, to get to Mexico, one has to travel southbound on I-10, so essentially east I-10, but it's in a southbound direction. Then I-19, which picks up as I-10 turns east, would then get on I-19 to go further south. I-19 stops at that intersection of I-10. Quite frankly, the defendant would have to travel this very route to smuggle the ammunition into Mexico, and then in fact, it was later confirmed that's what he was doing. That would be true if you're north of Phoenix. That would be true. I'm not aware of any other routes, but I'm not familiar enough with it. The reason I ask is that most of our cases, when they rely on the smuggler's route, are cases where it's a lot closer to Mexico and probably not necessarily an interstate highway. I'm not sure that figures into this case, but I think it makes some difference that he was detained north of Tucson versus south of Tucson. I understand Your Honor's point, but would just point out that if the ammunition was obtained in Phoenix, as it was here, that the individual would have to drive along this corridor to smuggle into Mexico. Again, and perhaps we look at the location in isolation, and if the court believes it diminishes the significance of that evidence, as we know, we have to look at everything as a whole, the totality of the circumstances, not focusing on one factor to the exclusion of all others, as the defendant does in his argument. And factors that viewed one by one in a vacuum that may seem innocuous, together can create reasonable suspicion. And here, the district court did that and properly found that reasonable suspicion existed for the temporary detention. And some of those factors were already mentioned. The very dark window tint that completely obscured the view of the ammunition in the back. The type of ammunition, again, this is not sporting ammunition, this is ammunition for semi-automatic pistols and rifles, AK-47 variants. But just a minute, the temporary detention would be for the purpose of officer security, correct? The temporary detention was for the, and the time of that detention was to call an experienced agent who had not only the familiarity with these types of offenses and the experience, but also the statutory authority to investigate. We're talking, we have to remember that this trooper is enforced with, I'm sorry, is responsible for enforcing Arizona traffic law, not federal statute. And there is no, and this is in the record, there is no state equivalent of this smuggling crime. So your position is that if there's reasonable suspicion for temporary detention, the temporary detention can include 45 minutes in handcuffs and not be an arrest? Yes, Your Honor, that is our position. But we would also, alternatively, we also alternatively believe that even if you were to find that this, the time and the use of handcuffs transformed the... ...temporary detention can extend under Terry for the period of time necessary to bring in the investigator which the prosecution chooses to use? I believe that it was the O'Looney case, and I apologize for the miscite. We cited it as Looney in page 17 in our brief, but the United States versus O'Looney at 544 Fed 2nd 385. This court found that when investigating firearm offenses, it was not unreasonable for officers to detain a suspect at a police station pending the arrival of ATF agents who are more familiar with federal firearms laws. And similar in U.S. versus Moore, this court found that detention was proper pending arrival of federal agents. In this case, U.S. Customs agents that were familiar with the suspected offenses. So, yes, Your Honor, I do believe that this court has, in fact, confirmed that this is a legitimate and reasonable investigative choice. And as the district court pointed out, the Supreme Court tells us in sharp that the question is not whether some other alternative for investigation was available, but whether the officer's choice was reasonable under the circumstances. And this court in Gallegos reached a similar conclusion, that it's not a question of one way and only one way, but what the Fourth Amendment requires is reasonableness. And it is our position that that choice, when we have a state trooper whose authority is to enforce traffic laws and has no authority or to investigate federal firearms or federal smuggling violations, that it was in fact reasonable under all these circumstances to call an experienced federal agent, which he did, and the district court did not clearly err in those factual findings. We have the defendant's suspicious statements. The statement about his sister, which was either a deliberate attempt, on one hand, a deliberate attempt to mislead the officers, or he was so nervous that he gave the wrong name of his sister. We have a tremendous, or what the court called, a massive amount of ammunition. In fact- Council, Judge Gould, if I could ask you a question, please. Does the government rest its position entirely on the theory that there was reasonable suspicion to support an extended Terry stop, while other investigators were calling it? Or does the government also take a position on whether there was probable cause to arrest if we consider this an arrest? The latter, Your Honor. We do believe that while the district court did not err in finding reasonable suspicion, as this court can affirm for any matter on the record, that even if this court were to find that reasonable suspicion was not enough for this extension of the detention, and it did turn into a de facto arrest, that there was probable cause for the arrest. And that probable cause is supported by these same factors. Again, and especially those that have already been then discussed, but especially the sheer amount of ammunition. Again, the federal agent who's experienced with these investigations even testified that that was one of the highest amounts he's ever seen. The fact that there was no innocent explanation, even fathomable, or I would submit a realistic expectation proffered by the defense for possession of this much of ammunition with an innocent purpose, especially given the direction of travel, the defendant's behavior, statements. But the defendant wasn't asked for an explanation. Wasn't asked for an explanation because instead of questioning, the trooper made the reasonable choice of calling an experienced agent. But the trooper did ask the defendant, I would point out, Your Honor, where he was going, what was the reason for his travel. Instead of making any statements that would have given any credence to some other legitimate possession of this ammunition, he avoids even mentioning the ammunition and says that he was visiting his mother. And so- He could have taken 20,000 rounds to visit his mother, and he could have not had the 20,000 rounds and gotten to Phoenix and just visited his mother and picked up 20,000 rounds, right? Neither of those seem to have much to do with visiting the mother. Correct, Your Honor. And again, we don't have to, for instance, rule out any possible innocent explanation for each factor in a vacuum. The even probable cause, as this court stated in the Brooks case, this isn't a high bar, really what we're looking for is reasonably trustworthy information that offense is being committed. Okay, yes, there may be an innocent explanation, but it was reasonable for the officer to come to that conclusion in light of all the factors taken together, not each in a vacuum in this divide and conquer method that this court has rejected, and again, the fact that the defendant subsequently admitted what the officer and the agent each independently suspected just further underscores the reasonableness of that conclusion, that there was reasonable suspicion. But again, if the court finds an arrest, that there was probable cause as well based on all those factors. And your time has expired. Thank you. Thank you. We'll give two minutes for rebuttal. Your Honor, addressing the probable cause issue, if what happened here, transporting a large quantity of legal ammunition, is not just enough, not just enough to detain, but enough to arrest somebody, then the exception has followed the rule, and the court would be authorizing the, not just detention, but the arrest of motorists between Phoenix and Tucson with large quantities of ammunition, even if, no matter what their intent was, even if their intention with it was something lawful. And that just can't be the case. The stop, the location of the stop is also vitally important. Because all we're concerned with is, what did the trooper know at the time he applied the handcuffs? Or if the arrest came later during the lengthy detention at that time. And all he knew was a location north of two counties in Arizona, north of a one million person county in Arizona. Eighty-eight miles from the border on a freeway that doesn't lead directly itself to a border in Arizona. These items are otherwise lawful to own. Under these circumstances, the court should require, at a minimum, a question. A question about what this otherwise lawful ammunition, what its purpose is, where it's destined for. A number of questions could easily, within a few minutes, determine if something is amiss here. That wasn't done. Because it wasn't done, we contend there wasn't enough for probable cause. Thank you, counsel. Thank you both for your arguments today, and also for flying in from Tucson for the argument. Good to see lawyers live in the courtroom again.
judges: THOMAS, GOULD, BEA